# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STEVEN L. ZIRKO,                  )
                                  )
        Plaintiff,        )
                                  )
        v.                )
                                  )    No. 10 C 08135
PARTHASARATHI GHOSH, M.D., et al., )
                                  )    Judge John J. Tharp, Jr.
        Defendants.       )

## MEMORANDUM OPINION AND ORDER

The plaintiff, Steven L. Zirko, brings suit against a number of personnel at Stateville Correctional Center ("Stateville"), under 42 U.S.C. § 1983, alleging that defendants Dr. Parthasarathi Ghosh, Dr. Catalino Bautista ("doctor defendants"), and former Warden Marcus Hardy acted with deliberate indifference by ignoring his complaints of pain in his back and jaw (Counts I and II). Counts III and IV claim willful and wanton conduct by the doctor defendants and by Hardy, respectively. Zirko also claims that defendants Karen Rabideau and Phyllis Baker ("library defendants," collectively with Hardy, "supervisor defendants") terminated Zirko from his prison job in retaliation for his First Amendment activity. All five defendants move for summary judgement. For the following reasons, the motions are granted as to Ghosh, Bautista, and Hardy but denied as to Rabideau and Baker.

Ghosh was the medical director at Stateville Correctional Center from June 2003 until his retirement on March 31, 2011. DSOF ¶ 2. Bautista covered the medical director position at Stateville briefly after Ghosh's retirement, from approximately mid-June 2011 to July 25, 2011. DSOF ¶ 3. In addition to the medical director, the health care unit ("HCU") at Stateville is typically staffed with one medical doctor and one physician assistant who see inmates for their medical issues and medical complaints. DSOF ¶ 10. The warden, nurses, physician assistants, and other physicians can refer an inmate to the medical director for an examination and evaluation. DOSF ¶ 10.

If an inmate is sick or has a medical problem that is not being followed by one of the chronic clinics,[2] the established procedure is for the inmate to request a sick-call. DSOF ¶ 11. The inmate will be seen initially by a nurse, and then subsequent appointments progress in stages where inmates are next seen by a physician assistant or a staff physician and then, if needed, by the medical director. *Id.* This progression of appointments is an IDOC rule because "[e]verybody wants to see [the] medical director." *Id*. The inmates, however, do not have the option to choose to see the medical director at any time for any reason. *Id*. If an inmate writes a letter requesting to be seen by the medical director, the request will be handled initially by a healthcare

---

[1] The Court takes the following facts from the doctor defendants' Statement of Material Facts ("DSOF") (Dkt. 166), where undisputed, Zirko's Response to the doctor defendants' Statement of Material Facts ("ZResp1") (Dkt. 174) and Statement of Additional Facts ("ZSOF1") (Dkt. 173), the doctor defendants' Response to Zirko's Statement of Additional Facts ("DResp") (Dkt. 182), the supervisor defendants' Statement of Material Facts ("SSOF") (Dkt. 164), where undisputed, Zirko's Response to the supervisor defendants' Statement of Material Facts ("ZResp2") (Dkt. 177) and Statement of Additional Facts ("ZSOF2") (Dkt. 176), and the supervisor defendants' Response to Zirko's Statement of Additional Facts ("SResp") (Dkt. 180).

[2] Zirko attended the hypertension (also called cardiac) clinic and the asthma clinic every four to six months for regular, ongoing treatment of related conditions. *See* Zirko Dep. at 33:3–34:6; D Ex. F at P00103-04.

administrator or director of nursing who determines the appropriate response or schedules the appropriate appointment. DSOF ¶ 12. The medical director usually would not see such a letter but might on occasion. *Id*.

The IDOC has a grievance process through which offenders can raise their various complaints. SSOF ¶ 22. The Illinois Administrative Code requires an offender to first attempt to resolve complaints though his counselor and, only if unsuccessful, to file a written grievance addressed to the grievance officer within 60 days after discovery of the problem that gives rise to the grievance. 20 Ill. Admin. Code § 504.810 (2015). Medical grievances are typically not seen by the medical director; they are routed to the healthcare administrator of the prison who will either provide a response or assign a nurse, a physician assistant, or a physician other than the medical director to review the matter for the assigned grievance officer.[3] DSOF ¶ 6.

Monthly quality assurance meetings are attended by the medical director, warden, healthcare administrator, director of nursing, mental health administrator, and pharmacy. DSOF ¶ 13; ZResp1 ¶ 13. At these meetings, the group discusses grievance topics, such as a lack of medical care, and discusses some of the specific inmate grievances. ZSOF1 ¶ 10. Ghosh testified that if an inmate is being seen regularly by a doctor or physician assistant for his medical issues but he nevertheless files a grievance requesting an appointment, that specific grievance would not be addressed at these meetings. ZD Ex. 8 at 101:20–102:18.

Marcus Hardy was the Warden/Chief Administrative Officer at Stateville. SSOF ¶ 5. Warden Hardy's duties included supervising the operation of the facility and affording offenders their due process. SSOF ¶ 6. Hardy testified that he did not directly review offender grievances

---

[3] Zirko denies this statement but does not offer evidence directly supporting his denial as required per Local Rule 56.1(b)(3). *See* ZResp1 ¶ 6. The evidence Zirko offers in response does not rebut the doctor defendants' statement but rather states a separate, but related, fact. *Id*.

but that he designated various assistants, including Kevin Senor ("LKS"), Kenneth Osborne ("KO"), or Mark Hosey ("MH"), to review all grievances. SSOF ¶ 23; S Ex. C Hardy Dep. at 31:22–32:4. Senor sometimes gave Hardy a grievance to review if it involved a difficult or questionable situation. S Ex. C at 11:3-8. Grievances marked as an emergency grievance are sent directly to Kevin Senor, who would determine if the grievance stated an actual emergency. SSOF ¶¶ 24, 28. Hardy testified that non-emergency grievances go to an inmate's counselor for review, and if the counselor is unable to respond, the grievance is forwarded to the appropriate area for review, then returned to the counselor. SSOF ¶ 25.

## I.    Medical Background

Zirko has been incarcerated in the Illinois Department of Corrections ("IDOC") at the Stateville facility since August 2009. DSOF ¶¶ 1, 26. Since an automobile accident in 1992, Zirko has suffered low back pain and was diagnosed with herniated discs in approximately 1995. DSOF ¶ 14. Left untreated, Zirko's herniated discs cause him intense pain that radiates throughout his lower back and legs and cause numbness and tingling sensations in his right leg. ZSOF1 ¶ 3. Prior to incarceration, Zirko's treatment for his low back pain included over-the-counter pain medication (Tylenol and Advil) and physical therapy. DSOF ¶¶ 14, 18. Zirko also received chiropractic care consisting of massage, manipulation, electrotherapy, and stretching, and his chiropractors recommended that he perform stretching exercises and lose weight to help manage his pain. DSOF ¶ 16. Although these treatments temporarily relieved his pain, the low back pain always returned, and Zirko continued to pursue "maintenance treatment." DSOF ¶ 17.

Before being transferred to Stateville, Zirko spent nearly five years in the custody of the Cook County Department of Corrections ("CCDOC"). DSOF ¶ 20. While in the CCDOC, Zirko's back pain continued and began to radiate into his right leg. DSOF ¶ 21. Zirko took

Robaxin (a muscle relaxant), Naproxen (a pain reliever), and Advil to manage his back pain. DSOF ¶ 23.

Upon transfer to the custody of the IDOC in July 2009, Zirko underwent a routine medical screening at the Northern Reception and Classification Center. Although Zirko testified that he told the medical technician who conducted the screening about his herniated discs, the medical records relating to the screening do not note any complaint of back pain or spinal deformity. DSOF ¶ 25; ZResp1 ¶ 25. Shortly thereafter, in September 2009, Zirko saw physician assistant ("PA") LaTonya Williams; during this appointment, Zirko complained of low back pain, among other things, but Williams noted no abnormalities upon examination, and Zirko had full range of motion in his extremities. DSOF ¶ 27. Williams assessed Zirko with chronic low back pain, as well as a number of other conditions: asthma, rhinitis, allergies, inflammation of the nose, allergic dermatitis, and dyslipidemia. DSOF ¶ 28. She referred Zirko to the asthma clinic and gave him a variety of medications: a cold/antihistamine medication, an Albuterol inhaler, Zocor (cholesterol medication), Naproxen, and Tramadol (a stronger pain reliever). *Id.* At the time of his admission to Stateville, Zirko had not had an MRI since 1995 and had never had any form of epidural steroid injection.[4] DSOF ¶ 26.

On February 8, 2010, Zirko filed an emergency grievance complaining that he had been unable to see Ghosh:

_____
[4] Zirko had a number of medical appointments unrelated to his back pain over the fall and winter of 2009 into early 2010: psychiatry appointment on 8/20/09; cardiac clinic on 10/12/09; asthma clinic on 10/13/09; various concerns on 10/17/09; optometry clinic on 12/8/09; various concerns on 1/11/10. *See* D Ex. F at P00010, P00014, P00016, P00020-22.

> [O]n at least 11 occasions, I have written to Medical Care for proper treatment for a pre-existing condition of arthritic back and compression disc of said. . . . [T]his writer has seen another Medical Doctor and was told by same that "I need to see Dr. Gosch (sic) and to write to him" as they "will not and cannot refer me." . . . I have been and am in severe pain, more often than not unable to walk or move without extreme pain. This facilitys (sic) actions and inactions are indicative of deliberate indifference.

ZD Ex. 3. Hardy's name appears on the signature line in handwriting, with the initials LKS next to it, and is dated March 3, 2010. A grievance officer reviewed the grievance on June 2, 2010, noting that the grievance appeared to be resolved, and Hardy's signature (accompanied by the initials KO) concurring in that view is dated June 22, 2010. ZD Ex. 10. Hardy testified that he did not recall seeing this grievance (or any of Zirko's grievances) nor did he recall talking to Zirko about his grievances. SSOF ¶ 29. Zirko appealed this grievance to the Administrative Review Board (the "Board") on July 7, 2010; the Board denied it on August 16, 2010. DSOF ¶ 7.

Zirko requested sick-call on February 25, 2010, and PA Williams saw Zirko on March 3, 2010. Williams extended Zirko's current medications and additionally requested Robaxin, a skin cream for fungal infection, a steroidal skin solution for itching, and Neurontin for neurological pain. DSOF ¶¶ 30-31. Williams also ordered a back brace and x-rays of Zirko's cervical, thoracic, and lumbar spine. *Id*. She planned to follow-up with Zirko three months later to see if the pain medication was helpful and planned to discuss Zirko's case with Ghosh for possible further management. *Id*. The x-rays, taken on March 3 and interpreted by the radiologist on March 9, 2010, showed minimal diffuse degenerative joint disease in the thoracic and lumbar spine. DSOF ¶ 33. This condition identified in the x-rays is typically treated with pain medication, like the medication Zirko was already receiving. *Id*.[5]

---

[5] On March 10, 2010 Zirko filed a grievance complaining about his back pain and noting that he had not yet received the back brace or pain medication PA Williams prescribed at the

On March 13, 2010, Zirko had an appointment with medical technician Wendy Olson to get Robaxin for the numbness in his leg. Zirko reported that he fell coming down from the top bunk in his cell, hitting his face on the metal bath area, and that his jaw "clicked" as a result. DSOF ¶ 35. Olson recommended a back brace and referred a permit for low bunk, low gallery to Ghosh for his approval. DSOF ¶ 36. She also prescribed Neurontin for nerve pain with a follow-up appointment in four weeks if Zirko felt no improvement and scheduled Zirko to see a physician on April 2, 2010 for his jaw pain. *Id.* Per Olson's request, Ghosh approved Zirko's medical permit for low bunk, low gallery on March 17, 2010. *Id.* Zirko stopped taking the Neurontin after a week or so because he suffered a number of adverse side effects and found the medication ineffective. DSOF ¶ 37; D Ex. A, Zirko Dep. at 54:12-16.

Zirko saw Dr. Zhang on April 3, 2010 for his facial contusion; Zhang noted that there was no marked deformity to Zirko's face but nevertheless ordered x-rays of his face based on Zirko's report of his fall.[6] DSOF ¶ 38. The x-rays, taken that same day, showed no evidence of a new injury but rather showed supportive plates from old surgeries to repair bilateral maxillary fractures. DSOF ¶ 39. The only injury Zhang noted from Zirko's fall was a facial contusion that was expected to heal on its own. *Id.*

---

March 3, 2010 appointment and that he had not yet seen Ghosh. ZSOF1 ¶ 6; ZD Ex. 4. The counselor noted that this was a duplicate grievance that raised the same issues as the February 8, 2010 grievance. ZD Ex. 4. Hardy's name appears on the signature line (with the initials KO) and is dated March 24, 2010. ZD Ex. 4. Zirko does not claim to have exhausted this grievance.

[6] Zirko contests the veracity of Zhang's notation, although the doctor defendants accurately paraphrased the medical records. ZResp1 ¶ 38. In response to this statement, Zirko cites to his declaration, explaining that Stateville's current medical director, Dr. Obaisi, diagnosed Zirko with a fractured jaw in November 2012, based on the April 3, 2010 x-rays. *Id.* This evidence in no way contradicts the fact that Zhang wrote that he observed "no marked deformity." The doctor defendants need not offer Zhang's notation for the truth of the matter asserted but rather only for its effect on Ghosh, Bautista, and Hardy under the subjective inquiry in the deliberate indifference analysis. *See supra* at 21-32; *McGee v. Adams*, 721 F.3d 474, 480-81 (7th Cir. 2013).

Zirko first saw Ghosh on May 13, 2010 as a result of the referrals from the medical staff for his back pain. DSOF ¶¶ 41-42. At that time, Zirko was taking Tylenol, Ibuprofen, and Aleve for his back pain and may also have been on Robaxin. *Id*. Ghosh examined Zirko's back, performed a straight leg raising test, and tested Zirko's motor function and deep tendon reflexes (which were normal). DSOF ¶ 44.[7] Ghosh's differential diagnosis included questionable lumbosacral disc prolapse or disc herniation. DSOF ¶ 45. Ghosh referred Zirko to the University of Illinois at Chicago Medical Center ("UIC") for an MRI, consolidated Zirko's medications by putting him on Motrin to avoid potential harmful side effects from taking multiple medications, and issued a special medical permit for an extra pillow and a back brace. *Id*.

There are no notations in the medical records that Zirko complained about his jaw pain at the May 13, 2010 appointment; Ghosh testified that he would have recorded the complaint if Zirko had made one. DSOF ¶ 43. Zirko, conversely, insists that he complained about his jaw pain and that he "specifically remember[s that Ghosh] . . . did not acknowledge it or write anything down about [his] jaw pain." ZResp1 ¶ 43; ZD Ex. 2, Zirko Decl. ¶ 31. Zirko states that he complained about the pain in his back and his jaw to every health care provider he saw at Stateville, although the medical records for the majority of Zirko's appointments contain no notations of complaints of jaw pain.[8] ZD Ex. 2, Zirko Decl. ¶ 32; Doc. Defs. Reply at 3-4, Dkt. 183.

---

[7] Zirko denies this statement; the evidence he cites, however, does not rebut the veracity of this statement. *See* ZResp1 ¶ 44 (*citing* ZD Ex. 2, Zirko Decl. ¶¶ 31-32 (stating that Ghosh never treated Zirko's jaw despite his complaints of pain in three examinations with Ghosh)).

[8] The medical records do not note any complaints of jaw pain at the following appointments: April 29, 2010; June 28, 2010; June 30, 2010; July 1, 2010; July 7, 2010; August 12, 2010; August 31, 2010; November 5, 2010, December 14, 2010; December 17, 2010; January 21, 2011; March 4, 2011; June 27, 2011. *See* D Ex. F at P00032, P00035, P00037, P00039, P00045, P00051, P00055, P00060-61, P00067, P00075.

On June 28, 2010, pursuant to Ghosh's referral, Zirko was taken to UIC for an MRI; due to back spasms, however, Zirko was unable to complete the test. DSOF ¶ 46. Two days later, on June 30, 2010, Ghosh requested that the MRI be rescheduled and set a follow-up appointment with Zirko on September 6, 2010. DSOF ¶ 47. At a July 1, 2010 appointment with a med tech to treat a rash, Zirko inquired about the status of his MRI and was informed that he had been referred and that the staff were waiting on UIC to provide a new date. DSOF ¶ 48.

On July 15, 2010, Zirko filed a grievance "directed at P.A. Williams," complaining that at a July 7, 2010 appointment, Williams "did address and prescribe for two medical issues" but when Zirko tried "to expound upon other urgent medical issues that called for immediate action including but not limited to previously prescribed medication by Medical Director that had adverse side effects and forced discontinuation, zygomatic bone issue and severe inflammation of Masseter muscle with intense pain," Williams stated that she would not address any additional issues. DResp ¶ 7; ZD Ex. 5. Zirko stated that "Williams (sic) actions and inactions are indicative of deliberate indifference" and requested an appointment with Ghosh or "some other Medical Director-Doctor." ZD Ex. 5. The counselor who addressed the grievance on July 26, 2010 noted that Ghosh requested Zirko's medical file to review and to determine if treatment was needed. *Id*. The grievance officer denied the grievance on December 3, 2010, noting that the issue appeared to be resolved, and Hardy concurred (with the initials LKS) on December 9, 2010. ZD Ex. 12. Zirko appealed this grievance to the Board on December 23, 2010; the Board denied the grievance on January 6, 2011, advising that "HCU Staff, in general, usually only see an offender for the specific issues already written on the HCU pass and for the reason they are there that day. Subsequent or unrelated issues brought up, usually require that another call pass be submitted." ZD Ex. 13.

On August 12, 2010, Zirko was transferred to UIC a second time for an MRI. This time, the examination was completed and showed a number of herniated discs and osteoarthritis. DSOF ¶ 51. Ghosh saw Zirko for a second time on August 31, 2010 to discuss the MRI; Ghosh then referred Zirko to the UIC pain clinic and issued a special medical permit for low bunk, low gallery, medical restraints, a left wrist support, and an extra mattress.[9] DSOF ¶ 52. Zirko was transported to the UIC pain clinic on November 5, 2010 for an initial evaluation; the physicians at the clinic noted multilevel disc bulging leading to foraminal and canal stenosis at L3 to Si and suggested a caudal epidural steroid injection, in addition to continuing pain management at the prison. DSOF ¶ 53. That same day, Ghosh requested approval for the epidural injection.[10] *Id.*

Zirko had a number of appointments at various clinics and to refill his pain medication between November 2010 and January 2011.[11] DSOF ¶¶ 54-56. Ghosh saw Zirko for a third time on January 21, 2011. DSOF ¶ 57. Zirko wanted to renew his medical permits, complained about cough and post-nasal drip, and inquired about an appointment at the UIC pain clinic. *Id.* Ghosh changed Zirko's medications and informed Zirko that the appointment at the pain clinic had been approved. *Id.* Ghosh also issued Zirko a medical permit for low bunk, front cuffing, medical

---

[9] Zirko again denies this statement, citing to Ghosh's Answer that he "lacks knowledge or information sufficient to form a belief about the truth of these allegations." ZResp1 ¶ 52 (*citing* Z Ex. 32, Ghosh Answer ¶ 33). That Ghosh did not have sufficient information at the time he answered the Third Amended Complaint, before discovery, does not contradict his deposition testimony supporting this statement.

[10] On October 29, 2010, Zirko filed a grievance noting that "Gosch (sic) order[ed] a cortisone shot in Spine and possible surgery, this has as of this date not yet happened." ZD Ex. 6. Zirko directed this grievance to officers in "B" house for not providing him with an extra mattress as permitted by his medical permit. *Id.* Hardy's name appears on the signature line (with the initials LKS) and is dated November 4, 2010. *Id.* Zirko does not claim to have exhausted this grievance.

[11] On January 11, 2011, Zirko filed a grievance "specifically directed towards Medical Appointment Setters" requesting an "immediate medical appointment that culminates in 5-10 minutes of facetime with Medical Director, Dr. Gosch (sic)." ZD Ex. 7. Zirko does not claim to have exhausted this grievance.

restraints, double mattress, extra pillows, back brace, wrist support, and a table and chair for his cell. DSOF ¶ 58. This permit was voided at the direction of the prison administration on January 27, 2011, however, because the table and chair were considered to be a security concern.[12] *Id.* Ghosh issued a replacement medical permit on January 27, 2011 with all of the previous allowances except the table and chair. *Id.*

Zirko received a lumbar epidural steroid injection at the UIC pain clinic on March 4, 2011. DSOF ¶ 60. Ghosh retired on March 31, 2011, and Bautista stepped in several months later to briefly fill the role of medical director. DSOF ¶¶ 57, 61. Zirko only saw Bautista once during his brief tenure as medical director, on June 27, 2011. Bautista's notes from the appointment include complaints of low back pain "on and off," rash, and allergy rhinitis. DSOF ¶ 61; D Ex. F at P00075. There is no note in the records of a complaint of jaw pain, although Zirko states that he complained about his jaw and that Bautista examined it. *See* ZD Ex. 1, Zirko Dep. at 62:4–63:3; Ex. 2, Zirko Decl. ¶ 33. Bautista ordered physical therapy for Zirko's back and prescribed Benadryl for his allergy, a two-month supply of Tylenol as needed for back pain, and two tubes of nystatin and Triamcinolone cream for Zirko's rash as well as a medical permit allowing Zirko special shower privileges for six months for low back pain relief. DSOF ¶ 63. Bautista left Stateville less than a month later, on July 25, 2011. DSOF ¶ 64.

Between his arrival at Stateville and the filing of this law suit, Zirko filed at least 26 grievances and fully exhausted 4 of those grievances:[13] (1) the February 8, 2010 grievance

---

[12] On February 2, 2011, Zirko filed a grievance regarding the voided medical permit for a table and chair in his cell. ZD Ex. 21. The grievance officer denied the grievance on October 20, 2011, and the Board noted "the grievance has been ruled no merit; therefore no action will be taken" on March 15, 2012. ZD Exs. 22-23.

[13] The doctor defendants dispute this statement by Zirko but cite no evidence. As such, this statement is considered admitted. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to

regarding claims of not receiving adequate treatment for back issues; (2) the July 15, 2010 grievance regarding PA Williams' refusal to consider Zirko's additional complaints; (3) the February 2, 2011 grievance regarding the voided medical permit for a table and chairs; and (4) the November 17, 2011 grievance directed at medical director Dr. Imhotep Carter for three days of missed medication. ZSOF1 ¶ 15; ZD Exs. 3, 5, 10-13, 21-26. Zirko also wrote a letter to the Board on July 5, 2011 and filed a grievance on July 8, 2011 against Stateville and unnamed administrators alleging that the facility has "a habit of not filing grievances," which prevented Zirko from exhausting his grievances.[14] ZD Exs. 14-15. Zirko acknowledges that he has been under the care of medical professionals the entire time he has been at Stateville, but he disagrees with the treatment provided to him and the timing of the treatment. DSOF ¶ 75.

## II.    Prison Employment Background

Inmates at Stateville can seek a prison job position by submitting their names for the specific position's waitlist; only certain inmates are eligible for employment and before being placed on a waitlist, the inmate is reviewed and is either approved or denied for submission to the waitlist. ZS Ex. 12, Warden's Bulletin. Stateville employs eight inmates at a time in the law library, each on a one-year term, but inmates can extend their terms (although, no inmate may serve three consecutive terms) with the approval of library supervisor and the Warden. ZSOF2

specific supporting material."). In their Statement of Facts, the doctor defendants cite to the affidavit of Sherry Benton for support that the February 8, 2010 grievance was the only exhausted grievance. DSOF ¶ 7; D Ex. E ¶ 7. Although Benton's affidavit only addresses the Board's response to the February 2010 grievance, it does not expressly state that Zirko did not appeal any other grievances to the Board. D Ex. E. The summary judgment record, however, includes the Board's responses to three additional grievances, which directly refutes the inference that one only grievance was exhausted.

[14] The grievances that Zirko cites as examples of occasions that Stateville administrators prevented him from exhausting either post-date the departures of both Ghosh and Bautista from Stateville (*i.e.* filed on January 17, 2012), *see* Resp. to Doc. Defs. at 5-6, or were not reviewed by the Board because Zirko failed to attach the corresponding reports from the grievance officers, *id*. at 6; ZD Ex. 20.

¶ 15; SResp ¶ 15; SSOF ¶ 40. Inmates submit their names to the waitlist of inmates seeking to become law clerks; inmates on the waitlist and qualified for the job are automatically rotated in on a first-come, first-serve basis—meaning "they are automatically put in [a law clerk position] if they are next on the list." ZSOF2 ¶ 15. Inmates coveted the law clerk positions. ZSOF2 ¶ 16.

Defendant Karen Rabideau was a correctional counselor at Stateville. SSOF ¶ 7. In that position, Rabideau acted as a liaison between the inmates and all other departments within the facility, facilitated legal calls for the inmates, attempted to answer any questions inmates may have had, and facilitated the grievance process. *Id*. Rabideau was also responsible for coordinating the hiring process for prison jobs at Stateville, including law clerks. ZSOF2 ¶ 15. Rabideau knew about some of Zirko's grievances because she responded to three of them herself and discussed several others with him. ZSOF2 ¶ 19. On January 25, 2011, Zirko filed a grievance against Rabideau for not moving Zirko to a different cell to accommodate his medical needs. *Id*.

At the time of the events at issue, Defendant Phyllis Baker was a librarian associate who managed the day-to-day operations of the law library: supervising the paralegals and the law clerks, paying the library bills, managing the budget, and ordering necessary materials. SSOF ¶ 10. As the library associate and supervisor of inmate law clerks, Baker made the recommendation to Rabideau (who, in turn, confirmed with the warden) about whether to extend a law clerk beyond the one-year term. ZSOF2 ¶ 20. Although Baker could not extend all law clerks, she tried to extend the terms of inmates who were "good law clerks" because she liked "having some familiarity with the law clerks that work with [library staff] on a consistent basis." ZSOF2 ¶ 21. Baker supervised Zirko during his term as a law clerk in the library and stated that he had been a good law clerk. SSOF ¶ 10; SResp ¶17.

Rabideau emailed Baker on April 27, 2011 regarding law clerk assignments for the June job changes. SSOF ¶ 43. Rabideau stated, "[Y]ou would be losing Zirko and Jones. I know we spoke about it before, and if I am correct, you weren't going to extend Zirko. What about Jones?" Rabideau listed the next ten names on the waitlist for law clerk positions (Zirko's name was not on this list) and included notations about various inmates, such as "not sure if we can hire him yet (still had enemy in E)" or "he just left over there in March, not sure if you want him back that soon?" ZS Ex. 13. Baker responded on April 28, 2011 that "Yes, you are correct Zirko is out," then discussed the next few names on the waitlist—who to bring back as a law clerk and who had been causing problems. ZS Ex. 14.

On June 17, 2011, Rabideau wrote to Zirko, informing him that his job assignment had expired. SSOF ¶ 45. Shortly thereafter, Zirko asked Baker why she did not extend his position. ZSOF2 ¶ 26. Zirko testified that Baker handed him a paralegal certificate and told him that she would like to have extended him as a law clerk but that he needed to have Rabideau's approval. ZSOF2 ¶¶ 26-27. Zirko then wrote to Rabideau, informing her of the conversation with Baker and seeking her approval to reinstate him as a law clerk. ZSOF2 ¶ 27. Baker initially denied having the conversation with Zirko about reinstating him, S Ex. E at 19:4-11 ("we had never talked about [reinstating him]"), then admitted to having the conversation, *id*. at 22:9-17 ("[H]e did speak to me about it," and "I told Zirko that if he wanted to become a law clerk again, he needed to submit his name to be put back on the law clerk rotation list."). On June 21, 2011, Zirko filed a grievance related to the failure to extend his term as a law clerk. ZSOF2 Ex. 18. As far as the record reflects, Zirko did not exhaust this grievance.

Baker testified that there was "[n]o particular reason" she did not ask to extend Zirko. S Ex. E at 19:20-21. She subsequently testified, however, that Zirko was in a light-duty position

14

because he had told her about his back problems; she did not require him to do any "strenuous work" and gave Zirko "a light-duty job in the general library where he could sit . . . [c]hecking in and out books, typing cards for books." *Id*. at 21:9-20. Baker initially denied having a conversation with anyone about whether to keep Zirko as a law clerk. *Id*. at 18:23–19:16. After she was presented with the April 27, 2011 email from Rabideau, however, Baker acknowledged that she and Rabideau had a conversation about not extending Zirko's position but said that she did not give a reason for not extending him. *Id*. at 24:7–25:18. Rabideau also testified that Baker did not give her a reason for not extending Zirko. S Ex. D, Rabideau Dep. at 27:19–28:20. Baker testified that she did not know whether any inmates filed grievances against Rabideau. S Ex. E at 31:5-7.

Baker also acknowledged that she did not reinstate a former law clerk who had filed a lawsuit against her because they "went through a long trial, and [she] didn't feel that he and [she] could work together any longer." *Id*. at 31:20–32:3. Baker then discussed a number of other inmates who had been law clerks and were not renewed but who were eventually rotated back into the law clerk position. *Id*. at 10:21–12:13; 27:24–28:16; 30:22–31:4. Zirko never filed a grievance against Baker, however, and Baker testified that she would not have a problem rehiring Zirko if he was on the waitlist to become a law clerk again. SSOF ¶¶ 53-54.

Zirko filed suit on December 22, 2010, alleging deliberate indifference against Ghosh regarding Zirko's back pain. Compl., Dkt. 1. Zirko amended his Complaint to add deliberate indifference claims against Bautista and Hardy, willful and wanton claims against Ghosh, Bautista, and Hardy, and a retaliation claim against Rabideau and unknown IDOC officials. Am. Compl., Dkt. 25. The Third Amended Complaint added Baker as a defendant. Third Am. Compl. ("TAC"), Dkt. 96. The doctor defendants filed a motion to dismiss, and the supervisor

defendants filed a motion for leave to file a PLRA Answer. Dkts. 107, 114. This Court denied both motions on November 30, 2012, Dkt. 125, and denied the supervisors' motion for reconsideration on January 3, 2013. The doctor defendants and supervisor defendants filed motions for summary judgment. Dkts. 162, 165.

## DISCUSSION

Zirko alleges deliberate indifference under § 1983, in violation of the Eighth and Fourteenth Amendments, as well as willful and wanton claims, against the doctor defendants and Hardy for ignoring his complaints of back and jaw pain. Zirko also alleges that the library defendants "terminated" his prison job in retaliation for his First Amendment activity. To prevail on their summary judgment motions, the defendants must demonstrate that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding the motions for summary judgment, the Court construes all disputed facts and draws all reasonable inferences in favor of Zirko, the nonmoving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). Summary judgment is only appropriate when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id*. Based on the record before the Court, the motions are granted as to Ghosh, Bautista, and Hardy and denied as to Rabideau and Baker.

## I. Deliberate Indifference Claims

### A. Exhaustion

The doctor defendants claim that Zirko failed to exhaust his administrative remedies with respect to his complaints concerning his medical treatment, in violation of the Prison Litigation

Reform Act ("PLRA").42 U.S.C. § 1997e(a).[15] Before filing suit, an inmate must properly utilize the prison grievance procedures in order to "[allow prisons] to address complaints about the program it administers before being subjected to suit, [reduce] litigation to the extent complaints are satisfactorily resolved, and [improve] litigation that does occur by leading to the preparation of a useful record." *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011) (*quoting Jones v. Bock,* 549 U.S. 199, 219 (2007)) (brackets in original). Failure to exhaust is an affirmative defense with the burden of proof on the defendants. *Id*. at 720.

The record shows that Zirko fully exhausted four of his grievances, specifically, those originating on February 8, 2010, July 15 2010, February 2, 2011, and November 17, 2011. Zirko only argues that two of these grievances are relevant to his complaints against Ghosh and Bautista—the February 8, 2010 and July 15, 2010 grievances. *See* Resp. to Doc. Defs. at 4-5, 7. The doctor defendants agree that Zirko exhausted the February 2010 grievance but contest the adequacy of that grievance as it relates to the claims at issue; because the February 2010 grievance "is not a complaint or criticism against either Dr. Ghosh or Dr. Bautista but rather a request to be seen by Dr. Ghosh," the doctor defendants argue, the grievance did not exhaust whether Ghosh or Bautista were deliberately indifferent to Zirko's complaints of pain.[16] Doc. Defs. Mem. in Supp. at 9-10, Dkt. 167.

The Illinois Administrative Code requires that a prison grievance "contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint." 20

---

[15] As noted below, Warden Hardy does not argue that Zirko failed to exhaust administrative remedies and so has waived that defense. *Phillips v. Walker*, 443 F. App'x 213, 215 (7th Cir. 2011) (failure to exhaust is an affirmative defense that is waived if not raised in an answer or motion for summary judgment).

[16] Zirko does not claim that Bautista was deliberately indifferent to his back pain, but only to his jaw pain. *See* TAC at 14-15; Resp. to Doc. Defs. at 12-13.

Ill. Admin. Code § 504.810(b). The purpose of the grievance is to provide "prison officials a fair opportunity to address [an inmate's] complaint." *Maddox*, 655 F.3d at 722. Zirko's February 2010 grievance stated that he had been repeatedly requesting medical treatment for "a pre-existing condition of arthritic back and compression disc of said" and that he was "in severe pain, more often than not unable to walk or move without extreme pain." ZD Ex. 3. The letter from the Board denying the grievance characterized Zirko's complaints as "claims that you are not receiving adequate treatment for back issues." ZD Ex. 11. That Zirko did not name Ghosh or Bautista in this grievance does not render it ineffective: "That [plaintiff] didn't specifically name the defendants in the grievance was a mere technical defect that had no effect on the process and didn't limit the usefulness of the exhaustion requirement." *Maddox*, 655 F.3d at 722; *see also Jones,* 549 U.S. at 219 (providing early notice to those who might later be sued is not one of the leading purposes of the exhaustion requirement). Thus, the February 8, 2010 grievance alerted Stateville officials to Zirko's complaints about a lack of treatment for his back pain and, therefore, satisfies the exhaustion requirement for his claim of deliberate indifference to his back pain as to anyone responsible for the allegedly inadequate care—up to that point.

It does not, however, suffice to exhaust all future claims of inadequate care; there must be a temporal limitation on the grievance. Where the conduct giving rise to the grievance is discrete (*e.g.*, treatment for a discrete problem), it seems clear that the grievance encompasses only that conduct and not similar conduct that occurred a month, or a year, later. *See, e.g., Palmer v. Fenoglio*, 510 F. App'x 476, 478 (7th Cir. 2013) (grievance submitted before inmate ever saw defendant doctor could not have challenged the doctor's conduct a month later); *cf*. 20 Ill. Admin. Code § 504.810 (stating the temporal limitation of 60 days to file a grievance *after* discovery of the problem). But what of the grievance, like Zirko's, that complains of a

continuing violation of the prisoner's constitutional rights? Does the fact that Zirko claimed in February 2010 that he had not received adequate care over the past six months relieve him from the requirement to file grievance forms in the future if the condition continues unabated? That appears to be Zirko's argument, since he maintains that his February 8, 2010 grievance sufficed to exhaust his claims against both Ghosh and Bautista as to their alleged indifference to his pain over the remainder of 2010 and well into 2011. The logic of the argument would produce absurd results that go beyond even what Zirko claims. Zirko does not assert a deliberate indifference claim regarding his back pain as to Bautista, yet by his logic, the February 2010 grievance would suffice to exhaust a claim that Bautista had been inattentive to Zirko's back pain after taking over for Ghosh in mid-2011, some 16 months after Zirko filed the grievance. Bautista, of course, could not possibly have been responsible for any alleged inadequacy of treatment delivered before he began working at Stateville, and the February 2010 grievance could not possibly have alerted the state to any shortcomings as to the care Bautista provided (and Zirko, to his credit, does not maintain that it did).

By the same token, it seems quite unreasonable to say that Zirko was required to renew his grievance every day that he continued to go without adequate treatment. In fact, the grievance Zirko filed on March 10, 2010 was not independently processed; it was considered a duplicate to the February 8, 2010 grievance because it raised the same issue of failure to treat his back pain. Presumably, then, a grievance in a situation like this must be deemed to have a shelf life that continues at least until some further action has been taken to address the situation giving rise to the grievance. Here, so far as the record reflects, the next medical attention Zirko received in connection with his complaints of back pain following the February 8 grievance was on March 3, 2010 with PA Williams, who prescribed Robaxin and Neurontin for Zirko's pain and ordered a

back brace and x-rays of Zirko's cervical, thoracic, and lumbar spine. Zirko maintains that this treatment was ineffective, but it cannot reasonably be said that his February 8 grievance put the state defendants on notice of the need for *further* corrective action after the March 3 date; for all anyone knew, at that point, the treatment afforded in March may have proved effective in alleviating Zirko's pain. Accordingly, Zirko cannot be deemed to have exhausted any claims with respect to his back pain after March 3, 2010 by virtue of his February 2010 grievance. To the extent that Zirko asserts any claim against Ghosh for indifference to his back pain after that date, that claim must be dismissed for failure to exhaust.

As for the July 15, 2010 grievance, it does not relate to any of Zirko's claims at issue here. Zirko attempts to characterize the driving force behind the July 15, 2010 grievance as a request for "medical care for the 'intense pain' from his untreated 'zygomatic bone' (*i.e.*, cheekbone) 'and severe inflammation of masseter muscle' (*i.e.*, the muscle around the jawbone)." Resp. to Doc. Defs. at 4. Zirko specifically indicated that this grievance related to PA Williams, however, and elaborated on how she refused to hear more than two of his complaints at the July 7, 2010 appointment. ZD Ex. 5. The grievance officer report addressing the grievance described Zirko's complaint as, "Grievant alleges that he attempted to address numerous medical concerns with L. Williams P.A. during MDSC on 07/07/10 but was not allowed to." ZD Ex. 12. After denying his appeal, the Board reminded Zirko of HCU practices for hearing multiple/unrelated medical issues at a sick-call appointment. ZD Ex. 13. Rather than alerting Stateville officials of Zirko's complaints related to his jaw pain, as Zirko now argues, this grievance (and the responses to it) focused on the problem of only hearing a limited number of complaints at one medical appointment. This grievance fails to exhaust Zirko's complaint of a lack of treatment for his jaw pain.

Zirko argues that he "filed several other grievances that prison administrators prevented him from exhausting." Resp. to Doc. Defs. at 5. In support of this argument, however, Zirko cites only one example of his frustrated efforts long after Ghosh and Bautista had left Stateville. *Id*. at 5-6. Moreover, for the five other grievances Zirko appealed that the Board did not consider on the merits, Zirko failed to attach the grievance officer responses, as required for administrative review. *Id*. at 6; ZD Ex. 20. Zirko, in short, failed to present any evidence that prison officials frustrated his efforts to exhaust his grievances; rather, Zirko's examples demonstrate his failure to comply with Stateville's grievance procedures, which is a requirement for proper exhaustion. *See Maddox*, 655 F.3d at 721 (*citing Jones*, 549 U.S. at 218) ("The 'applicable procedural rules' that a prisoner must properly exhaust are defined not by the PLRA, but by the prison grievance process itself."). And there is can be no question that Zirko was familiar with those procedures. *See Wagoner v. Lemmon*, 778 F.3d 586, 591 (7th Cir. 2015) ("The fact that [plaintiff] was able to exhaust two of his claims offers a reason to reject his claim that he was prevented from exhausting his other [claims].").

Zirko properly exhausted the February 8, 2010 grievance regarding inadequate treatment of his back pain, which permits his claim against Ghosh for deliberate indifference to his back pain to proceed through March 3, 2010. Conversely, Zirko failed to exhaust any grievances that arose after that date relating to his treatment for back pain. He also failed to exhaust any grievances that alerted Stateville administrators to his complaints of inadequate treatment of his jaw pain.

### B.    Deliberate Indifference to Zirko's Back Pain

Section 1983 provides a cause of action for persons who, under color of law, are deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United

States. 42 U.S.C. § 1983. Liability under § 1983 requires personal responsibility; a supervisory official satisfies this requirement "if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (internal citations and quotations omitted).

The Eighth Amendment, as incorporated through the Fourteenth Amendment, imposes a duty on states "to provide adequate medical care to incarcerated individuals." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) (*quoting Johnson v. Doughty,* 433 F.3d 1001, 1010 (7th Cir. 2006)). Prison officials violate this duty "if they display deliberate indifference to serious medical needs of prisoners." *McGee*, 721 F.3d at 474 (*quoting Johnson*, 433 F.3d at 1010). To state a claim for deliberate indifference, Zirko must prove: (1) that he has an objectively serious medical need, one that has "been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention," *Gomez v. Randle,* 680 F.3d 859, 865 (7th Cir. 2012); and (2) that the defendants were aware of his serious condition and were deliberately indifferent to it. *See McGee*, 721 F.3d at 481. To establish the subjective element of deliberate indifference, Zirko must show more than negligence but need not show that the officials intended or desired to cause him harm. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Courts have equated deliberate indifference with recklessness: "the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

## i. Serious Medical Need

The parties do not dispute that Zirko was diagnosed with herniated discs over two decades ago and that, when left untreated, Zirko's herniated discs cause him intense pain that

radiates throughout his lower back and legs and cause numbness and tingling sensations in his right leg. The Seventh Circuit has explained that a medical need is serious if failure to treat the condition could result in "wanton infliction of pain" and has noted indications of a serious medical need: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008). Zirko has been receiving treatment for his herniated disks for over 20 years, and they continue to cause him chronic pain. These undisputed facts satisfy the objective element of "serious medical need."

### ii. Deliberate Indifference Through March 3, 2010

Zirko must next demonstrate that a reasonable trier of fact could conclude that Ghosh was "subjectively aware of [Zirko's] serious medical condition and either knowingly or recklessly disregarded it." *Hayes*, 546 F.3d at 524. Because § 1983 does not provide for vicarious liability, Zirko has to provide evidence of an individual defendant's knowledge and actions to hold that individual liable. *See Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). Zirko acknowledged that Ghosh most likely would not have seen the letters requesting to see Ghosh that Zirko referred to in the February 8, 2010 grievance because they were handled by healthcare administrators or the director of nursing. Instead, Zirko points to the monthly meetings where Ghosh and other Stateville administrators discussed prison issues, including some specific inmate grievances. Ghosh testified that if an inmate is being seen regularly by a doctor or physician assistant for his medical issues (as Zirko was) but nevertheless files a grievance requesting an appointment, that specific grievance would not be addressed at these meetings. Zirko disputes that his grievance would not have been discussed at these meetings and, taking the

evidence in a light most favorable to Zirko, the Court will assume Zirko's February 8, 2010 grievance came up at a monthly meeting, alerting Ghosh to Zirko's complaints of back pain.

Assuming Ghosh was aware of Zirko's complaints and reviewed Zirko's treatment sometime within the month following the February 2010 grievance, however, there is no reasonable basis to conclude that Ghosh was deliberately indifferent to Zirko's back pain. As of February 8, 2010, Zirko had been at Stateville approximately six months. During that period, he had a routine screening upon entrance to IDOC in July 2009. Shortly thereafter, Zirko saw PA Williams and complained of low back pain; PA Williams performed an exam and noted no abnormalities and a full range of motion in Zirko's extremities, but nevertheless credited Zirko's complaints of pain and prescribed a number of medications, including two different pain relievers (Naproxen and Tramadol). Over the next few months, Zirko regularly attended the chronic clinics and had various other medical appointments (such as appointments with the psychiatrist and optometrist). He also had his prescriptions for pain relievers refilled as necessary. D Ex. F at P00107, P00110-22. At the March 3, 2010 appointment, PA Williams prescribed two new medications for Zirko's pain (Robaxin and Neurontin) and ordered a back brace and x-rays of Zirko's cervical, thoracic, and lumbar spine.

Thus, assuming that Ghosh reviewed Zirko's medical record in response to the February 2010 grievance, he would have seen that the HCU staff members were responding to Zirko's complaints, treating him with various medications to manage his pain and attempting different medications when he continued to complain of unmanaged pain. The March 3, 2010 appointment shows that staff were taking additional steps, such as ordering an x-ray—to further investigate and treat Zirko's back pain when the prescribed medications were not working. That Ghosh did not step in immediately to take over Zirko's case does not evidence deliberate indifference when

other medical professionals were exploring the efficacy of different options to treat a chronic condition. *See, e.g., Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (not deliberate indifference to respond to complaints of ineffective medications by changing dosages or prescribing new medications). An inmate "is not entitled to demand specific care. [H]e is not entitled to the best care possible. [H]e is entitled to reasonable measures to meet a substantial risk of serious harm." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). The evidence in the record, even viewed in a light most favorable to Zirko as the non-moving party, does not support a conclusion that Ghosh knew of, but disregarded, Zirko's back pain.

### iii. Deliberate Indifference Post-March 3, 2010

Even if Zirko had exhausted a grievance against Ghosh for conduct after March 3, 2010 (and again, he has not), his claim for deliberate indifference would still fail; the first evidence of Ghosh's actual awareness of Zirko's back pain is Ghosh's approval of Zirko's low bunk, low galley permit on March 17, 2010, after Zirko's March 13, 2010 appointment. At that time, Zirko's medical records reflected that he was being treated with pain medication, that he had recently received an x-ray showing minimal diffuse degenerative joint disease in the thoracic and lumbar spine, and that he had been prescribed a back brace and a low bunk, low gallery permit. The records also showed an upcoming appointment with Dr. Zhang for Zirko's jaw pain and a follow-up with a med tech to evaluate the efficacy of the new pain medication for his back. Ghosh first saw Zirko two months later at the May 13, 2010 appointment.

Zirko's reliance on *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) to support his contention that a two-month delay between Ghosh's awareness of Zirko's pain and his first appointment with Zirko shows deliberate indifference is misplaced. In *Berry*, the Court held that it would have been reasonable for a jury to conclude that the jail nurse and doctor refused to refer

an inmate to a dentist or to take x-rays for a toothache, despite knowing that the pain treatment that had been provided was ineffective, opting instead to pass the prisoner's problem off to state authorities after the prisoner was transferred back to the department of corrections. *Id*. at 438-39. The evidence in *Berry* permitted a finding that the defendants had "adhered to" what they knew to be an ineffective treatment program without exploring even the obvious alternative of referring the prisoner for a routine dental examination. *Id*. at 441.

Here, by contrast, when Ghosh reviewed the permit requests for Zirko in March 2010, he saw that Zirko had recently received an x-ray to diagnose the cause of his pain, had been switched to a new pain medication, a back brace had been ordered, and, of course, that he had been recommended for low bunk, low galley permits to alleviate strain on his back. This was anything but adherence to a course of treatment that had been proven to be ineffective; it represented a new and broader program of treatment in response to Zirko's ongoing complaints of pain. That Ghosh did not immediately step in to see Zirko when he granted the medical permit does not demonstrate that he was indifferent to Zirko's medical condition in light of the information indicating that other members of the medical staff were responding to, rather than ignoring, Zirko's complaints.

When this new course of treatment also proved ineffective, moreover, Ghosh examined Zirko personally. Ghosh saw Zirko on May 13, 2010 and thereafter, Ghosh promptly took further measures to investigate and resolve Zirko's complaints of back pain. The same day as the initial appointment, Ghosh referred Zirko to UIC for an MRI. When Zirko was unable to complete the MRI due to back spasms, two days later Ghosh submitted the request to reschedule the MRI and set a follow-up appointment to discuss the MRI with Zirko. Ghosh saw Zirko approximately two weeks after the MRI, on August 31, 2010, and immediately referred him for an evaluation at the

UIC pain clinic. When the pain clinic recommended treatment for Zirko at the November 5, 2010 evaluation, Ghosh immediately submitted a request for approval for an epidural steroid injection. At the January 21, 2011 appointment, Ghosh informed Zirko that the appointment at the pain clinic had been approved and issued a special permit for a table and chair for Zirko's cell (which Ghosh was later required to void for safety and security reasons). Zirko received the epidural injection on March 4, 2011, a few weeks before Ghosh retired.[17] This timeline is hardly a description of deliberate indifference; rather, it shows a conscientious and engaged provision of progressively more substantial and expensive medical services to address a chronic problem that had bothered the prisoner for many years before he was ever in custody. *Compare Pyles*, 771 F.3d at 408 (no deliberate indifference relating to treatment for back pain even where defendant physician refused to schedule the plaintiff for an MRI or to see any other outside specialist).

Although Zirko continued to have back pain "on and off" despite the pain medication and epidural injection, a "prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'" *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996) (*quoting Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir. 1974)). For example, in *Pyles*, an inmate alleged that the prison doctor was deliberately indifferent to his back pain because he "continued to prescribe ineffective drugs, while ignoring [the inmate's] complaints of continuous and worsening back pain." *Id*. at 407. The Seventh Circuit affirmed the grant of summary judgment for the doctor:

---

[17] The time delay between Ghosh requesting outside appointments and Zirko being approved and taken to such appointments is, so far as the record reflects, no fault of Ghosh.

> We agree with the district court that the undisputed evidence establishes that Dr. Fahim was not deliberately indifferent to Mr. Pyles's pain. When Mr. Pyles complained that his medications were not helping, Dr. Fahim responded by prescribing new medications or changing the dosages. Mr. Pyles may have wanted different treatment, but his disagreement with Dr. Fahim does not allow him to prevail on his Eighth Amendment claim. As far as this record shows, Dr. Fahim's choice of treatment was not blatantly inappropriate.

*Id*. at 412. So, too, here; Ghosh's treatment was intended to, and did, alleviate some, if not all, of Zirko's pain. That it did not provide complete relief does not establish that those prescribing the treatment were deliberately indifferent to Zirko's condition. Unfortunately, "back pain [is] a common ailment." *Id*. "As many, many sufferers of chronic back problems are aware, that malady is often a condition that many have to learn to live with. At best, the pain can be controlled and the patient can take steps to alleviate discomfort and to avoid exacerbating the condition." *Glass v. Rodriguez*, 417 F. Supp. 2d 943, 948 (N.D. Ill. 2006). Zirko has "not submit[ted] evidence from which a jury reasonably could find that Dr. [Ghosh's] exercise of medical judgment departed significantly from accepted professional norms." *Pyles*, 771 F.3d at 411.

Any deliberate indifference analysis requires the court to consider the totality of the care provided. *See Dunigan ex rel. Nyman v. Winnebago County,* 165 F.3d 587, 591 (7th Cir. 1999). Here, the record reflects that Zirko received comprehensive medical treatment, notwithstanding Zirko's inability to see Ghosh as quickly as he desired. Rather, the series of appointments, first with a PA at sick-call, then with a physician, then eventually with Ghosh, followed IDOC's standard procedure. Because "[e]verybody wants to see [the] medical director," IDOC has established this procedure with the progression of appointments. DSOF ¶ 11. And once Ghosh became involved in Zirko's case, he acted promptly in requesting and following-up on Zirko's

back treatments and referring him to outside specialists. Accordingly, the evidence demonstrates that Ghosh provided constitutionally acceptable medical treatment for Zirko's back pain. Thus, Ghosh's motion for summary judgment as to his deliberate indifference to Zirko's back pain is granted.

### C. Deliberate Indifference by Bautista

As discussed above, Zirko failed to exhaust any grievance related to his jaw pain and/or Bautista's treatment. Even if Zirko had exhausted such a complaint, Bautista was not deliberately indifferent to Zirko's jaw pain. Bautista only saw Zirko once, on June 27, 2011. Although there is no notation of a complaint of jaw pain, Zirko insists that he made such a complaint at this appointment. Had Bautista reviewed Zirko's medical records with respect to complaints of jaw pain, he would have seen the April 3, 2010 appointment with Dr. Zhang where Zhang noted no marked deformity to Zirko's face and the note that his facial contusion was expected to heal on its own. Bautista also would have seen the x-rays and the notation that they showed no evidence of a new injury but rather showed supportive plates from old surgeries. Moreover, although Zirko states that he complained about his jaw to every medical professional he saw, the medical records do not note any complaints of jaw pain at the following appointments: April 29, 2010; June 28, 2010; June 30, 2010; July 1, 2010; July 7, 2010; August 12, 2010; August 31, 2010; November 5, 2010, December 14, 2010; December 17, 2010; January 21, 2011; March 4, 2011. Bautista would not have had any reason to know—other than Zirko's word, assuming he informed Bautista that he had been complaining for over a year—that Zirko had continuous jaw pain since his 2010 fall. And even if Zirko informed Bautista of his repeated complaints, that was directly contradicted by the lack of notation in over a year's worth of medical records.

Furthermore, Zirko was already taking prescribed pain relievers for his back pain (which Bautista renewed at this appointment). There is no evidence that Bautista would have prescribed additional pain relievers for Zirko's jaw pain, other than those Zirko was already taking for his back pain. Based on medical records that showed no fracture a year prior and that lacked any indication of complaints since the April 3, 2010 appointment, there is no evidence that Bautista's failure to provide any additional treatment for Zirko's jaw constituted indifference to a known risk of harm. Even if Zirko had exhausted a grievance as to Bautista's deliberate indifference to his jaw pain, summary judgment would be granted to Bautista.

### D.     Deliberate Indifference by Hardy

Zirko claims that Hardy knew of Zirko's back and jaw pain, knew that the treatment he was receiving for his back was ineffective, and knew that he was not receiving any treatment for his jaw.[18] As already stated, to prove Hardy was deliberately indifferent, Zirko must show more than negligence and must show that Hardy "knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno*, 414 F.3d at 653. To be liable under § 1983 as a supervisor, Hardy "must know about the [unconstitutional] conduct and facilitate it, approve it, condone it, or turn a blind eye." *Gentry*, 65 F.3d at 561.

Hardy testified that he had no personal knowledge of Zirko's grievances and that those to whom he delegated the task of reviewing the grievances never brought them to Hardy's attention. The Illinois Administrative Code § 504.805(a) permits the warden to delegate the duty of reviewing grievances. A warden cannot use this delegation to escape personal knowledge and liability, however, "without disclosing to whom [the task of reviewing grievances] was

---

[18] As noted above, Hardy has not argued that Zirko failed to exhaust his administrative remedies; therefore, the argument is waived. See *Winsett v. Washington*, 130 F.3d 269, 273 (7th Cir. 1997) ("[A] party waives those issues it fails to raise in the district court.").

delegated." *Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *5 (N.D. Ill. July 2, 2001).

Nonetheless, a warden is shielded from liability when a plaintiff is receiving ongoing care from medical professionals.[19] *See, e.g.*, *Berry*, 604 F.3d at 440 ("As a nonmedical administrator, [warden] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [plaintiff]."); *Ortiz v. Bezy*, 281 F. App'x 594, 598 (7th Cir. 2008) ("[A] non-medical prison official is not deliberately indifferent for relying upon medical staff to make appropriate decisions regarding treatment."); *Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir.2006) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (warden insulated from liability because he believed medical staff were addressing plaintiff's medical needs).

The evidence demonstrates that Hardy oversaw a healthcare unit that responded to Zirko's complaints of pain (albeit, not as quickly or in the manner Zirko desired). At the time Hardy's subordinate saw and signed each of the three grievances on his behalf, medical professionals were attending to Zirko's complaints. For example, Hardy "signed" the February 8, 2010 grievance on March 3, 2010—the same day that Zirko saw PA Williams for new pain medication, a back brace, and an x-ray of his back. Clearly medical practitioners were addressing Zirko's complaint of back pain at that time. Next, Hardy "signed" the March 10, 2010 grievance

---

[19] In *Flournoy v. Ghosh*, 881 F. Supp. 2d 980 (N.D. Ill. 2012), a case Zirko relies on to support finding a warden liable for a lack of medical care, the warden responded to a number of grievances for failure to fill medication prescriptions as "resolved," despite the medical records showing it took months for the inmate to finally get his prescription. *Id.* at 991. The court noted that "[d]epending on the content of a particular grievance, [a warden] might justifiably rely on the response of the Healthcare Unit to conclude that a medical issue was being properly handled by medical staff[ because, the warden], of course, had no medical training or basis on which to disagree with a treatment plan." *Id.* But in *Flournoy*, it did not require medical judgment to determine that the inmate was not receiving his medications, and thus, the Court denied the warden's summary judgment motion. *Id.* at 992. Zirko, on the other hand, was receiving medical treatment throughout his incarceration at Stateville, and treating Zirko's complaints involved the exercise of medical judgment.

for Zirko's back pain and the fall where he hit his jaw on March 24, 2010, shortly after a med tech had seen Zirko to provide a new type of pain medication and to schedule an appointment for Zirko's jaw injury, and Ghosh had just approved Zirko's medical permit. Again, medical professionals were attending to Zirko's back and jaw pain at the time Hardy's subordinate signed this grievance. Lastly, Hardy "signed" the October 29, 2010 grievance (which complained that Zirko had not yet received a cortisone injection) on November 4, 2010, the day before Zirko's appointment at the UIC pain clinic.[20]

Hardy was entitled to rely upon the treatment recommendations provided by the doctors and medical professionals treating Zirko. Even taking the evidence in a light most favorable to Zirko, there is insufficient evidence for a jury to find that Hardy was aware of and deliberately indifferent to Zirko's complaints of back and jaw pain.

### E.    Willful And Wanton Conduct by the Doctor Defendants and Hardy

This Court has already recognized that the "'willful and wanton [standard] is "remarkably similar" to the deliberate indifference standard.'" Mem. Denying Mot. to Dismiss at 23, Dkt. 126 (*quoting Williams v. Rodriguez,* 509 F.3d 392, 404-05 (7th Cir. 2007)). "Conduct is willful and wanton under Illinois law if it constitutes 'a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property.'" *Chapman v. Keltner*, 241 F.3d 842, 847 (7th

---

[20] Zirko also argues that the July 15, 2010 grievance (which complained that Zirko had not received treatment for his jaw pain) and the January 11, 2011 grievance (which requested to see Ghosh) show that Hardy had notice of and disregarded Zirko's complaints. Resp. to Sup. Defs. at 4-6. Neither Hardy nor any of his subordinates signed these two grievances, so there is no evidence that Hardy was aware of them. Moreover, both complaints had already been addressed or were addressed shortly after filing; for the July 2010 grievance, Zirko had already received an x-ray of his jaw showing no new injury and his facial contusion was expected to heal on its own, and for the January 2011 grievance, Zirko received the requested appointment with Ghosh ten days later.

Cir. 2001) (*quoting* 745 ILCS 10/1–210). Zirko's claims of willful and wanton conduct by Ghosh, Bautista, and Hardy fail for the same reasons his deliberate indifference claims fail.

## II. Retaliation Claim

Zirko alleges that Baker and Rabideau chose not extend his position as a law clerk in retaliation for the "prolific" number of grievances he had filed.[21] Resp. to Sup. Defs. at 10. To prove his First Amendment retaliation claim, Zirko must prove that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Gomez*, 680 F.3d at 866 (*quoting Bridges v. Gilbert,* 557 F.3d 541, 546 (7th Cir. 2009)). Baker and Rabideau do not contest that, by filing grievances, Zirko engaged in protected First Amendment activity. The library defendants contest that not extending Zirko's law clerk position past the standard one-year term is a deprivation and that there is no nexus between Zirko's grievance activity and the decision not to extend his law clerk position.

Positions as law clerks are highly coveted, and Zirko argues that "[r]emoving an inmate from a sought-after position in a prison constitutes the kind of deprivation that would likely deter future First Amendment activity." Resp. to Sup. Defs. at 10. The library defendants argue that, because prisoners have no claim of entitlement to a prison job and because Illinois is an at-will employment state, Zirko has no property interest in continued employment in the prison library.

---

[21] On June 21, 2011, Zirko filed a grievance related to the failure to extend his term as a law clerk. ZSOF2 Ex. 18. As far as the record reflects, Zirko did not exhaust this grievance. His failure to exhaust his administrative remedies would bar his retaliation claim, *see, e.g., Bates v. Sullivan*, 6 F. App'x 425, 427 (7th Cir. 2001) (failure to grieve retaliation claim waived inmate's claim), but for the defendants' failure to raise the waiver defense. The defendants have therefore "waived the waiver," *see, e.g.*, *United States v. Prado,* 743 F.3d 248, 251 (7th Cir. 2014), and the Court proceeds to consider the merits of Zirko's claim based on the summary judgment record.

Sup. Defs. Mem in Supp. at 11-12 (*citing Wallace v. Robinson*, 940 F.2d 243, 248-49 (7th Cir. 1991); *Harris v. Eckersall*, 331 Ill. App. 3d 930 (1st Dist. 2002)). Zirko did not raise a procedural due process claim, however; he raised "a First Amendment retaliation claim, to which the liberty/property interest requirement for procedural due process claims does not apply." *DeWalt v. Carter*, 224 F.3d 607, 613 (7th Cir. 2000). This Court already noted that an "act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." Mem. Denying Mot. to Dismiss at 23-24 (*quoting Gomez*, 680 F.3d at 866). Thus, the failure to extend Zirko as a law clerk, although the library defendants could have done so for a number of permissible reasons, is a "deprivation" if the action was taken because Zirko had filed grievances.

Zirko has produced sufficient evidence, if barely, to support a reasonable jury's determination that the failure to extend his position was done in retaliation. Zirko concedes that he has no direct evidence of retaliation (it is the rare plaintiff who can produce such evidence). His "mosaic" of circumstantial evidence, however, when considered in a light most favorable to Zirko, is sufficient to create a material dispute as to whether his term was not extended in retaliation for his grievance-filing. *See* Resp. to Sup. Defs. at 10-11. With respect to Baker, she admitted that Zirko had been a good law clerk, that she tried to extend good law clerks, and that she would not have a problem rehiring Zirko if he was on the waitlist to become a law clerk again. Nevertheless, her testimony as to why Zirko was not extended after his first term is inconsistent. When first asked the question, Baker said that there was "no particular reason" she did not extend Zirko. S Ex. E at 19:20-21. When asked the same question again, Baker used the "light-duty" explanation, that Zirko could not do any of the strenuous work moving the "legal boxes." *Id*. at 21:9-17. She reverted to the "no reason" mode, however, when the subject came up

again later in the deposition. *Id*. at 29:3-11. Baker also admitted that she had not reinstated as a law clerk another inmate who had filed a lawsuit against her in the past. *Id*. at 31:20–32:7. The defendants do not argue that this evidence would be inadmissible under Fed. R. Evid. 404(b); instead, they ignore it.

Additionally, Baker testified inconsistently about a number of conversations: she first denied having a conversation with anyone about whether to keep Zirko as a law clerk. *Id*. at 18:23–19:16. Only after she was presented with the April 27, 2011 email from Rabideau did Baker acknowledge that she and Rabideau had a conversation about not extending Zirko's position. *Id*. at 24:7–25:18. Baker also initially denied having the conversation with Zirko about reinstating him, *id*. at 19:4-11 ("we had never talked about [reinstating him]"), then changed course and admitted to having the conversation, *id*. at 22:9-17 ("[H]e did speak to me about it," and "I told Zirko that if he wanted to become a law clerk again, he needed to submit his name to be put back on the law clerk rotation list.").[22]

A reasonable jury could infer that Baker's inconsistent testimony and the conflict between what she told Zirko—that she wanted to extend his position but Rabideau objected—and what is apparent from the email exchange—that Baker made the decision that "Zirko is out"—supports Zirko's claim that Baker retaliated against him. That credibility determination is for a jury to make and prevents summary judgment as to Baker. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("[O]ur job when assessing a summary judgment motion is not to weigh

---

[22] Zirko's response in opposition to summary judgment undercuts his claim of retaliation as to Baker: Zirko maintains that he spoke with Baker after his termination, and she explained that she wanted to extend his term but that Rabideau would not agree to do so. *See* Resp. to Sup. Defs. at 11-12. Although this argument undermines Zirko's position, when considered in conjunction with Baker's inconsistent testimony about that conversation, the Court cannot conclude that no reasonable jury would find for Zirko against Baker.

evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts.").

As to Rabideau, Zirko notes that as a correctional counselor, she knew about his grievance activity, had personally signed a number of his grievances, and was even the subject of one of Zirko's grievances on January 25, 2011, approximately five months before his term was not extended. Furthermore, the record reflects that Baker and Rabideau had a conversation prior to the email exchange concerning not extending Zirko's position; both Baker and Rabideau testified that, in that initial conversation, Baker did not give Rabideau a reason for not extending Zirko. Zirko, on the other hand, argues that his "grievances made him a target [ ] worth having a special conversation about . . . ." Resp. to Sup. Defs. at 13. This disagreement is sufficient to raise an issue of fact as to the contents of and motivations underlying Rabideau and Baker's initial conversation which resulted in Zirko being "out." The Court cannot conclude that it would be unreasonable for a jury to infer that, based on the grievance Zirko filled against Rabideau and the off-the-record conversation about not extending his position, that Rabideau and Baker did so out of retaliation for Zirko's grievances. This is not to suggest that a jury is likely to find in Zirko's favor, only that it could not be labeled irrational if it did so based on this record.

Because Zirko has raised an issue of fact as to Baker's credibility and as to Baker and Rabideau's motivations in the decision not to extend his law clerk position, summary judgment is denied as to defendants Baker and Rabideau.

* * *

Because no reasonable jury could find for Zirko on his claims of deliberate indifference or willful and wanton conduct, summary judgment is granted to defendants Ghosh, Bautista, and Hardy. The Court cannot say, however, that this record would preclude a reasonable jury from

finding for Zirko on his First Amendment retaliation claim. Summary judgment as to Baker and Rabideau is, therefore, denied.

Dated: October 26, 2015

John J. Tharp, Jr.
United States District Judge